UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                  :
DAVID MOON,                       :
                                  :
        Petitioner,               :    Civ. No. 17-3759 (NLH)
                                  :
    v.                            :    OPINION
                                  :
STEVEN JOHNSON,                   :
THE ATTORNEY GENERAL FOR THE      :
STATE OF NEW JERSEY,              :
                                  :
        Respondents.              :
_____ :

APPEARANCES:
David L. Moon, No. 157230C
New Jersey State Prison
PO Box 861
Trenton, NJ 08625
    Petitioner pro se

Patrick Daniel Isbill
Camden County Prosecutor's Office
25 North Fifth Street
Camden, NJ 08102
    Counsel for Respondents

HILLMAN, District Judge

    Petitioner David L. Moon ("Petitioner"), a prisoner

presently incarcerated at New Jersey State Prison in Trenton,

New Jersey, has filed a Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 (the "Petition").  ECF No. 1.

Respondents Steven Johnson and the Attorney General for the

State of New Jersey ("Respondents") filed an Answer to the

Petition (the "Answer").  ECF No. 5.  For the following reasons,

the Court will deny the Petition and a certificate of

appealability shall not issue.

## I. BACKGROUND

In its opinion on direct appeal, the Superior Court of New
Jersey, Appellate Division, provided the following summary of
the factual background of Petitioner's case:

> Defendant David L. Moon appeals from a final
> judgment of conviction and sentence. A jury
> found him guilty of purposeful or knowing
> murder, *N.J.S.A.* 2C:11-3a(1); endangering an
> injured victim, *N.J.S.A.* 2C:12-1.2;
> possession of a firearm for an unlawful
> purpose, *N.J.S.A.* 2C:39-4a; unlawful
> possession of a firearm, *N.J.S.A.* 2C:39-5b;
> and hindering his own apprehension, *N.J.S.A.*
> 2C:29-3b(1). He was acquitted of felony
> murder, robbery and one count of hindering
> apprehension, and the jury found that he did
> not act in the heat of passion resulting
> from reasonable provocation. We reverse
> defendant's conviction for endangering an
> injured victim but affirm all other
> convictions. The sentence imposed and our
> reasons for remanding for clarification of
> that sentence are discussed in section III
> of this opinion.
>
> Corie Carter died as a consequence of a
> gunshot wound to his head. Within hours of
> the shooting, defendant was arrested. He
> admitted that he had fired the fatal shot
> and explained why. The following description
> of the events is based on defendant's
> statement and the trial testimony given by
> Willie Carter (Carter) and John Martinez
> (Martinez), who were with defendant and
> Corie. Defendant did not testify, but the
> jurors heard a recording of the statement he
> gave to the police.
>
> Defendant, Corie, Carter and Martinez spent
> the evening and early-morning hours of
> February 22 and 23, 2003, in a fenced and

gated lot in Camden where Martinez kept his
trailer home. The men were reminiscing about
a friend who had recently died, talking and
"rapping." Others joined them during the
course of the night. Everyone was drinking,
but Carter did not notice anyone who was
drunk and was not aware of anyone smoking
marijuana.

After the others left the lot and Martinez
was in his trailer, defendant and Corie got
into a debate about "God" and the "well-
being of human beings." The debating turned
to quarreling, and they stood "face to
face." Carter stepped between them three
times. On his third attempt to calm them
down, he noticed a gun in Corie's hand and
stepped away. Corie fired the gun three or
four times. Defendant, who had turned away
from Corie, felt the bullets "whiz past"
him. Carter saw the "sparks" from Corie's
gun and saw defendant check himself to see
if he was shot. Defendant was not hit.
Martinez had heard loud voices and a popping
sound from inside the trailer. When he came
outside, he saw Corie with a gun in his
hand. Corie put the gun away, and Martinez
went back inside.

To Carter, after Corie fired his gun,
defendant appeared as if he were in shock
but did not seem angry. Defendant stayed and
talked for about ten or fifteen minutes
after the shooting.

Defendant gave a detailed account of his
conversation with Corie. They agreed that
things were "straight" between them and
shook hands. Then Corie handed defendant his
gun and said, "shoot me." Defendant was
"shocked" by that statement and gave the gun
back to Corie, who laughed and offered
defendant something to eat. Defendant ate
some rice but afterwards felt "freaked out"
by what had happened. He left to take a
walk. Martinez heard defendant say he would
be back.

Defendant returned and spoke to Corie.
Carter could not hear what they were saying
but assumed everything was alright because
they were talking in a friendly way. He
thought defendant was trying to make Corie
feel "comfortable."

Defendant explained that he came back to
"make sure that everything was okay" between
him and Corie. He walked up to Corie, asked
if they were "cool," and gave him a hug and
kiss. Corie warned defendant that if he told
anyone what had happened, he would kill him.
Defendant described his reaction: "When
[Corie] told me he was going to kill me, I
just snapped, not really snapped, I just
took out the, the gun I had that was in my
pocket.... I ... pulled the trigger. The
body dropped."

Carter heard the shot and saw Corie fall to
the ground. According to Carter, after
defendant shot Corie, he said "don't nobody
be shooting at me." Defendant closed and
locked the gate to the lot. Carter saw him
drag and kick the body. Because defendant
removed Corie's gun, Carter assumed
defendant was looking for the gun when he
kicked Corie. Martinez, who heard the shot
and Carter yelling, came outside again. He
saw defendant with two guns. Corie was in a
"sitting position" near a truck on the lot.
Martinez did not realize that Corie had been
shot until defendant pushed him with his
foot and Corie "slumped over" into the snow
and did not move.

Corie's body was moved to the street.
According to Martinez, he unlocked the gate
but refused to help defendant. According to
defendant, Martinez told him to move the
body off his lot, gave him a hand truck and
helped.

Carter, who left when Martinez unlocked the
gate, went to his mother's home. She called
a relative whose husband is a homicide

detective. Carter took the police to the lot, and Carter and Martinez left with the police. As they traveled to headquarters, Carter spotted defendant. He was arrested and gave his statement.

When asked about the guns, defendant said he had sold Corie's gun and thrown his own gun away near a factory between Second and Third Streets. He explained his lack of certainty about where he threw his gun: "Everything was going crazy man, you know, I ain't going to lie. I was smoking a little wet, you know some PCP so ahh, my vision was like jumpy, and I was just like wow, wow, wow ... when I touched the gun...."

The investigating officers found Corie's body about seventy-five yards from the gate outside Martinez's lot. There was blood on the ground. Inside the lot, they found one "quart bottle of King Cobra Premium Malt," one twelve-ounce can of beer and what appeared to be a burned marijuana cigarette. They also found containers of Chinese food.

Although the police did not find the gun where defendant said he had discarded it, he subsequently admitted that he had hidden it under a couch in his uncle's home. The police recovered the gun from that spot.

An autopsy was performed within hours of Corie's death. The bullet entered his head just above and behind his right ear. It traveled across his head and through both halves of his brain. From the condition of Corie's clothing and the appearance of his wound, the medical examiner concluded that the gun was held to Corie's head when the shot was fired.

In the opinion of the medical examiner, the extensive damage to Corie's brain would have incapacitated him instantly, and he was dead or dying when his face hit the ground. Corie had an abrasion under his ear and a

"substantial split" inside his mouth where
his lip and cheek hit his teeth. Neither
injury showed any of the swelling, bruising
or bleeding that would be present if his
blood were circulating at the time of the
impact. In the medical examiner's words,
these were "terminal collapse" injuries.
While Corie's heart could have continued to
beat "erratically" for a few minutes after
he was shot and a pulse could have been
detected for a short time, "[t]o all intents
and purposes, he was dead" when shot. His
heart could not continue to beat without his
brain.

The doctor was not asked about and did not
mention the blood on the ground under
Corie's body.

Corie's blood had an alcohol content of
.096. There were traces of marijuana and PCP
in his urine, but not in his blood. In the
opinion of the medical examiner, the trace
evidence of the drugs was indicative of
consumption up to two or three days before
his death.

State v. Moon, 933 A.2d 11, 12–14 (N.J. Super. Ct. App. Div.

2007).

Following Petitioner's conviction at trial, he filed an

appeal with the Superior Court of New Jersey, Appellate

Division.  See id.  Petitioner raised the following claims:

I. THE TRIAL COURT ERRED TO DEFENDANT'S
GREAT PREJUDICE IN DENYING A REQUESTED
CHARGE AS TO VOLUNTARY INTOXICATION.

II. THE TRIAL COURT ERRED IN DECLINING TO
GRANT A MISTRIAL FOLLOWING THREE HIGHLY
PREJUDICIAL IMPROPRIETIES.

A. The Prosecutor Expressed Personal
Opinion Of Guilt In Her Opening.

6

> B. The State Twice Elicited Highly
> Prejudicial Evidence As To A "Mugshot"
> Of The Defendant, And The Trial Court's
> Response Was Grossly Inadequate.
>
> III. THE CONVICTION OF ENDANGERING AN
> INJURED VICTIM WAS UNSUPPORTED BY COMPETENT
> FACTS IN THE RECORD.
>
> IV. THE TRIAL COURT IMPOSED AN EXCESSIVE
> SENTENCE.
>
> A. The *Quantum* Of The Sentence Is
> Excessive.
>
> B. The Court Erred In Imposing
> Consecutive Sentences.

Id. at 14.

The Appellate Division reversed and dismissed Petitioner's conviction for endangering an injured victim but affirmed his other convictions. See id. at 16; see also ECF No. 8-9 at 19. The New Jersey Supreme Court denied Petitioner's request for certification. See State v. Moon, 940 A.2d 1219 (N.J. Jan. 18, 2008).

Petitioner thereafter submitted his first petition for Post-Conviction Relief ("PCR"). See ECF No. 8-19. On November 15, 2013, a hearing on the petition was held before the Honorable Lee A. Solomon, J.S.C. See ECF No. 8-54. Following oral argument from the State and defense counsel, Judge Solomon denied the petition, issuing a decision from the bench. See id. at 13-30. Following the PCR court's denial, Petitioner appealed

to the New Jersey Appellate Division. See ECF No. 8-22. In his submission, he raised the following claims:

> DEFENDANT'S MURDER CONVICTION MUST BE REVERSED BECAUSE OF COUNSELS' INEFFECTIVENESS, AND THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS
>
>> A. Trial and Appellate Counsel Failed To Pursue The Erroneously Repeated Jury Charge Regarding Passion/Provocation Manslaughter.
>>
>> B. Trial Counsel "Invited Error" That The Jury Review Defendant's Recorded Statement During Its Deliberations.
>>
>> C. Trial Counsel Misadvised Defendant To Reject The State's Plea Offer.
>>
>> D. Trial Counsel Failed To Consult Adequately With Defendant.

ECF No. 8-23 at 2; see also State v. Moon, No. A-2957-13T1, 2015 WL 6394433, at *3 (N.J. Super. Ct. App. Div. Oct. 23, 2015).

The Appellate Division issued an opinion remanding the matter back to the PCR court for an evidentiary hearing on "what exactly trial counsel had advised about the chance of success on the provocation issue when the State's plea offer was still on the table." See State v. Moon, 2015 WL 6394433, at *5-6. The Appellate Division held however, that the remainder of Petitioner's claims were without merit. See id. at *3-6. Petitioner appealed to the New Jersey Supreme Court. See State

v. Moon, 129 A.2d 331 (N.J. 2016). Certification was denied on February 5, 2016. See id.

On remand to the PCR court, the Honorable Samuel D. Natal, J.S.C. held an evidentiary hearing during which both trial counsel and Petitioner testified. See ECF No. 8-55. In a written opinion, Judge Natal denied Petitioner's claim that trial counsel had been ineffective in advising Petitioner about the State's plea offer. See ECF No. 8-26 at 10. Petitioner again appealed the PCR court's decision to the Appellate Division. See ECF No. 8-32. On November 23, 2016, the Appellate Division affirmed the PCR court's decision. See State v. Moon, No. A-2957-13T1, 2016 WL 6900736 (N.J. Super. Ct. App. Div. Nov. 23, 2016). Petitioner appealed to the New Jersey Supreme Court. See State v. Moon, 158 A.3d 1179 (N.J. 2017). Certification was denied on January 26, 2017. See id.

In May 2017, Petitioner timely filed the instant habeas petition, pro se. See ECF No. 1. His application raises the following claims:

> GROUND ONE: COUNSEL FAILED TO COMMUNICATE
> WITH HIS CLIENT AS REQUIRED BY THE RULES OF
> PROFESSIONAL RESPONSIBILITY OF THE STATE OF
> NEW JERSEY
>
> GROUND TWO: TRIAL COUNSEL MIDADVISED
> DEFENDANT TO REJECT THE STATE'S PLEA OFFER
>
> GROUND THREE: THE TRIAL COURT ERRED TO
> DEFENDANT'S GREAT PREJUDICE IN DENYING A
> REQUESTED CHARGE AS TO VOLUNTARY

INTOXICATION

GROUND FOUR: THE TRIAL COURT MISSTATED THE
LAW AS TO THE PASSION/PROVOCATION
MANSLAUGHTER CHARGE

GROUND FIVE: TRIAL COURT JUDGE'S FAILURE TO
PROVIDE A PROPER CORROBORATION CHARGE
VIOLATED DAVID L. MOON'S RIGHTS TO DUE
PROCESS AND A FAIR TRIAL U.S. CONST. AMEND.
XIV; N.J. CONST. (1947) ART. I PARA I AND
ALSO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

GROUND SIX: TRIAL AND APPELLATE COUNSEL WERE
INEFFECTIVE FOR FAILING TO OBJECT AND [SIC]
TRIAL OR TO RAISE APPELLATE ISSUE REGARDING
TAPED STATEMENTS BEING BROUGHT INTO THE JURY
ROOM

GROUND SEVEN: THE TRIAL COURT ABUSED ITS
DISCRETION WHEN IT ERRONEOUSLY CHARGED THE
JURY ON THE UNANIMITY OF A VERDICT SUCH AN
ERROR DEPRIVED DEFENDANT OF HIS FUNDAMENTAL
RIGHTS TO DUE PROCESS AND A FAIR TRIAL

GROUND EIGHT: THE TRIAL COURT ERRED IN
DECLINING TO GRANT A MISTRIAL FOLLOWING
THREE HIGHLY PREJUDICIAL IMPROPRIETIES

ECF No. 1.

## II. STANDARD OF REVIEW

A petition for writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 is the proper mechanism for a state prisoner to challenge
the fact or duration of his confinement where the petitioner
claims his custody is in violation of the Constitution or the
laws of the United States. See 28 U.S.C. § 2254(a); Cullen v.
Pinholster, 563 U.S. 170, 181 (2011); Preiser v. Rodriquez, 411
U.S. 475, 498-99 (1973). A habeas petitioner bears the burden

of establishing his entitlement to relief for each claim presented in the petition. See Harrington v. Richter, 562 U.S. 86, 98 (2011).

The standard used in reviewing habeas claims under § 2254 depends on whether those claims have been adjudicated on the merits by the state court. If they have not been adjudicated on the merits, the Court reviews de novo both legal questions and mixed factual and legal questions. See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). If the state court adjudicated the claim on the merits, then 2254(d) limits the review of the state court's decision as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . .

28 U.S.C. § 2254(d).

If a claim has been adjudicated on the merits in state

court,[1] this Court has "no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Parker v. Matthews, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A court must look for "the governing

---

[1]     "[A] claim has been adjudicated on the merits in State court proceedings when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground." Lewis v. Horn, 581 F.3d 92, 100 (3d Cir. 2009) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009)). "Section 2254(d) applies even where there has been a summary denial." Pinholster, 563 U.S. at 187. "In these circumstances, [petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." Id. (quoting Harrington v. Richter, 562 U.S. 86, 98 (2011); see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted.").

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." <u>Parker</u>, 567 U.S. at 48-49 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" <u>Williams</u>, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Williams</u>, 529 U.S. at 410).

## III. DISCUSSION

### A. Ineffective Assistance of Counsel

In his § 2254 action, Petitioner raises several ineffective assistance of counsel claims against his trial attorney. See ECF No. 1 at 9-19, 28-29. Specifically, Petitioner argues that his trial counsel failed to adequately communicate with him; misadvised him to reject the State's plea offer; and failed to object to the jury's access during deliberations to Petitioner's formal statement to police. See id. Petitioner also alleges that his appellate counsel was ineffective for not raising the issue of the jury's access during jury deliberations to his pretrial statement. See id. at 28.

The Sixth Amendment of the United States Constitution provides: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). A showing of ineffective assistance of counsel requires two components to succeed. See id. at 687. The two requisite proofs are as follows: (1) a defendant must show that counsel's performance was deficient; and (2) the defendant must show prejudice. See id.

When a convicted defendant complains of deficient performance, the defendant's burden of proof is to show that the conduct of counsel fell below an objective standard of reasonableness. See id. at 688. Hence, "[j]udicial scrutiny of counsel's performance must be highly deferential." See id. at 689. To combat the natural tendency for a reviewing court to speculate whether a different strategy at trial may have been more effective, the Supreme Court has "adopted the rule of contemporary assessment of counsel's conduct." See Maryland v. Kulbicki, 136 S. Ct. 2, 4 (2015) (quoting Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)). Thus, when reviewing for an ineffective assistance of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." See Woods v. Donald, 135 S. Ct. 1372, 1375 (2015) (quoting Strickland, 466 U.S. at 689); cf. United States v. Chronic, 466 U.S. 648, 659 (1984) (holding that courts may presume deficient performance and resulting prejudice if a defendant "is denied counsel at a critical stage of his trial").

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" See Woods, 135 S. Ct. at 1376 (quoting Burt v. Titlow, 571 U.S. 12, 15

15

(2013)); see also Cullen, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); see also Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a Strickland claim evaluated under the § 2254(d)(1) standard . . . ."); see also Yarborough, 541 U.S. at 6 ("Judicial review of a defense attorney ... is therefore highly deferential––and doubly deferential when it is conducted through the lens of federal habeas."). Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." See Harrington, 562 U.S. at 105.

As to proving prejudice under Strickland, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Strickland, 466 U.S. at 693. To succeed on this proof, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hinton v. Alabama, 571 U.S. 263, 272 (2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). A reasonable probability is a probability which sufficiently undermines confidence in the outcome of the trial. Strickland, 466 U.S. at 694.

*i. Failure to Communicate with Petitioner*

Petitioner first claims that his trial counsel was
ineffective for only visiting with Petitioner in the holding
cell at the courthouse and not independently visiting Petitioner
at the county jail.  See ECF No. 1 at 10.  Petitioner asserts
that this "lack" of interaction between himself and his lawyer
impacted his "ultimate actions and sentence."  See id.
Petitioner alleges this conduct is even more egregious because
it also resulted in the inadequate investigation of viable
defenses such as self-defense, passion provocation, or voluntary
intoxication.  See id.

Petitioner first raised this claim during his PCR
proceedings.  The PCR court held, in relevant part:

> In the present matter, petitioner alleges
> that trial counsel was deficient because he
> never -- he did not visit the jail and only
> saw petitioner in the holding cell on Court
> days, resulting in an inadequate
> investigation of viable defenses, specific -
> - specifically, passion provocation and
> intoxication.
>
> The Supreme Court has concluded and held in
> State v. Savage that it is not the frequency
> of consultation that reveals whether a
> defendant has been effectively denied legal
> assistance.  Rather, the proper inquiry is
> whether as a result of that consultation
> counsel was able to properly investigate the
> case and develop a reasonable defense.  120
> N.J. at 617.
>
> When a petitioner claims that counsel
> inadequately investigated his case he must

17

> assert the facts that an investigation would
> have revealed, supported by affidavits or
> certifications based upon the personal
> knowledge of the affiant -- affiant or
> person making the certification. That's out
> of State versus Cummings, 221 N.J. Super. at
> 170.
>
> The petitioner must demonstrate had or more
> -- how a more thorough investigation or
> preparation for trial would have had a –
> would have had the likelihood of changing
> the outcome of the trial. On this issue,
> however, the petitioner fails to demonstrate
> under the second prong of Strickland that
> but for trial counsel's alleged inadequate
> investigation, the results of the trial
> would have been different.

ECF No. 8-54 at 23.

The PCR court went on to explain that trial counsel did, in fact, present the defense of passion provocation to the jury, which "demonstrate[ed] that trial counsel sufficiently investigated the case and presented a viable defense." See id. The PCR court noted that trial counsel had also elicited testimony from the State's witnesses about the fact that Petitioner had indeed been drinking and possibly smoking marijuana on the night of the murder. See id. at 24. The PCR court ultimately held that Petitioner had failed to demonstrate that trial counsel's investigation was inadequate or that further investigation would have changed the outcome of the trial. See id. at 24-25.

On appeal, the Appellate Division summarily dismissed this claim, stating only: "Finally, defendant contends trial counsel was ineffective because he did not consult with him when he was in the jail as opposed to the holding cell at the court house. We conclude this argument lacks sufficient merit to warrant discussion in a written opinion." Moon, 2015 WL 639443, at *6.

At the outset, this court notes that the Third Circuit has previously acknowledged that it is "certainly not aware of any constitutionally required minimum number of face-to-fact visits a counsel must arrange in order to provide effective representation." See United States v. Nguyen, 379 F. App'x 177, 180 (3d Cir. 2010). The more pertinent inquiry here then is whether the alleged lack of communication resulted in an inadequate investigation by defense counsel, as Petitioner alleges. To demonstrate that counsel conducted an incomplete investigation which resulted in prejudice to the petitioner, the petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained [. . .] and whether such information, assuming admissibility in court, would have produced a different result." See Brown v. United States, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016) (quoting United States v. Askew, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)).

Here, Petitioner has not demonstrated how trial counsel's failure to visit him in prison resulted in an inadequate investigation of certain defense theories. See ECF No. 1 at 10. During the evidentiary hearing before the PCR court, Petitioner's trial counsel testified that he and Petitioner had "lengthy" discussions about Petitioner's possible defenses. See ECF No. 8-55 at 4. Trial counsel stated, in pertinent part:

> [STATE]: Okay. Based on those facts did you at some point advise Mr. Moon regarding what his defenses could be at trial?
>
> [TRIAL COUNSEL]: Yes, Mr. Moon and I had lengthy conversations with regard to what his defenses were. Mr. Moon essentially was, you know, aware that -- from discussions and aware from his own education that he wanted to pursue a passion provocation defense. I had also indicated to him that there, there may also have been a possibility of a self-defense in light of the words that he used and in light of the facts surrounding the case, that the individual had shot at Mr. Moon, you know, not too long prior to when this incident happened. So we certainly did talk about passion provocation manslaughter. We talked about self-defense as, as part of his defenses.

Id. at 4-5.

Petitioner himself even testified at the evidentiary hearing that trial counsel had spoken to him about presenting theories of both self-defense and passion provocation. See id. at 19.

He [trial counsel] said he checked the case.
And my case isn't like any case that he ever
has seen before. So he said, you know, the
guy attacked you. He just basically was
just -- laid out my case in front of me, of
what he had read. So he said, you know,
this is really self-defense because it was
you or him. He shot at you. He threatened
your life. He said, you know, I understand
this. He said we going for the self-
defense. He said but if we don't get the
self-defense he going -- we should get the
passion provocation.

Id. at 19.

As the PCR court laid out, Petitioner's counsel indeed
presented evidence of each of these defense theories at trial.
See ECF No. 8-54 at 23-24. Trial counsel presented Petitioner's
taped statement to police where he explained that the victim had
shot at him several times and threatened to kill him, and he
aptly used the testimony of the State's investigator, Ronald
Moten, to support this defense. See ECF No. 8-50 at 56-58.
Investigator Moten testified, in pertinent part:

Before going on tape, I finally stated to
[Petitioner] okay, the floor is yours. Okay
it's time for you now to explain in your own
words what happened. His response was, you
know, you know what happened, you know. You
know, the guy shot at me. He threatened to
kill me. I didn't want any problems. I'm
willing to cooperate. But he threatened to
kill me after he had already shot at me, so
I defended myself, you know.

ECF No. 8-48 at 70-71.

During summation, trial counsel used this testimony to demonstrate both theories of self-defense and passion provocation, asserting that the only way Petitioner could protect himself on the night of the crime was by using deadly force.  See ECF No. 8-50 at 57.

Additionally, trial counsel also elicited testimony from the State's witnesses about Petitioner's possibly intoxicated state.  Specifically, counsel elicited from witness Willie Carter that everyone, including Petitioner, had been drinking the night of the murder.  See ECF No. 8-46 at (5T85-3 to 20).  Defense counsel also elicited from Investigator Moten that Petitioner had told him he had been drinking alcohol and smoking marijuana laced with PCP the night of the shooting.  See ECF No. 8-49 at 74.  At the jury charge conference, trial counsel also requested an instructed be provided to the jury regarding voluntary intoxication.  See ECF No. 8-50 at 44.  However, the trial court ruled that such a charge was not appropriate.  See id. at 50-52.

Thus, despite Petitioner's allegation that trial counsel's failure to visit him in the county jail resulted in defense theories not being "investigated, or presented as thoroughly as possible," trial counsel did, in fact, skillfully present each of the defenses Petitioner mentions.  See ECF No. 1 at 10.  Significantly, Petitioner does not allege what additional

information trial counsel could have investigated, nor has he established a reasonable probability that any additional investigation would have changed the result of his criminal proceeding.  See Hinton, 571 U.S. at 272.  Accordingly, the state court's adjudication of this claim was not contrary to clearly established federal law.  Petitioner is not entitled to habeas relief on this claim.

### ii. *Misadvising Petitioner Regarding State's Plea Offer*

Petitioner next contends that his trial counsel was ineffective for not "properly" advising him "concerning the pleas that where [sic] being offered."  See ECF No. 1 at 13. Petitioner alleges that if he had been aware that he could receive forty-years imprisonment if convicted at trial, then he would have "most certainly accepted the State's [plea] offer." See ECF No. 1-2 at 17.

On appeal from the PCR court's denial of this claim, the Appellate Division held:

> Here, in defendant's initial appeal to us on
> his petition for PCR, he contended counsel
> was ineffective for advising him to reject
> the plea offer. Following the evidentiary
> hearing and the PCR court's findings, he
> shifted his position. He now asserts
> counsel's assessment he had a good chance of
> being convicted of merely
> passion/provocation manslaughter, if not
> acquitted, induced him to reject the subject
> plea offer; amounting, in effect, to counsel
> advising him to reject the plea offer.

As defendant ultimately conceded, counsel
never guaranteed it was a certainty he would
be acquitted or, if not acquitted, convicted
of passion/provocation manslaughter. As even
defendant admitted, had counsel made such a
representation, defendant would have "looked
[at] him like he was crazy." Moreover, the
PCR court found counsel credible when he
asserted he did not proffer predictions on
the outcome of a trial, and merely advised
defendant what his sentencing exposure would
be if convicted by a jury or pled guilty to
the subject offenses.

The competent evidence is counsel did not
explicitly forecast the outcome of the trial
and it is uncontroverted he never advised
against accepting the subject plea offer.
Even if counsel implicitly exuded optimism
about the outcome of the trial, defendant
conceded he was aware counsel did not know
with certainty how a jury would decide his
case. Thus, defendant knew there was a risk
he would be convicted of murder, for which
he would have to serve a multi-year term of
imprisonment.

Because defendant's petition is void of the
requisite proof counsel provided ineffective
assistance, we find no basis to vacate the
December 9, 2015 order [of the PCR court].

Moon, 2016 WL 6900736, at *4–5.

To establish an ineffective assistance of counsel claim

where a defendant rejected a plea offer, the defendant must show

that counsel's advice during the plea process was not "'within

the range of competence demanded of attorneys in criminal

cases.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting

McMann v. Richardson, 397 U.S. 759, 771 (1970)).  Petitioner

must also show that:

> but for the ineffective advice of counsel
> there is a reasonable probability that the
> plea offer would have been presented to the
> court (i.e., that the defendant would have
> accepted the plea and the prosecution would
> not have withdrawn it in light of
> intervening circumstances), that the court
> would have accepted its terms, and that the
> conviction or sentence, or both, under the
> offer's terms would have been less severe
> than under the judgment and sentence that in
> fact were imposed.

Lafler v. Cooper, 132 S.Ct. 1376, 1385 (2012).

Here, Petitioner is unable to establish that his counsel

was ineffective.  The gravamen of Petitioner's claim is that

trial counsel did not explain to him the advantages and

disadvantages of accepting a plea offer versus proceeding to

trial.  However, this assertion is not borne out by the record.

During the evidentiary hearing, trial counsel testified that he

would not have told Petitioner to reject or accept a specific

plea offer and that he most certainly would have advised

Petitioner of the sentencing exposure he faced if Petitioner

either proceeded to trial or if he accepted the State's offered

plea.  Specifically, trial counsel stated, in pertinent part:

> [STATE]: Do you recall ever telling Mr. Moon
> he would, he would do -- he would probably
> do as well at trial if he took a 12-year
> plea?

[TRIAL COUNSEL]: No, you know, my practice is essentially to advise the client of all possible repercussions from going to trial or accepting pleas, essentially advising them, you know, what the charge is. And this is even before you get to the pretrial memorandum stage where the, where the judge does that. You know, I tell him, you know, look, you know, you're charged with first degree homicide. Obviously first degree homicide, your sentencing range is 30 to life. However, if you go to trial there is the possibility that the jury may convict you of something less than the homicide, such as an aggravated manslaughter. The sentencing ranges for that are this. Reckless manslaughter, the sentencing ranges are this. And certainly we talked about passion provocation manslaughter and the sentencing range was that. And again, did discuss with him, you know, there is also the possibility that, you know, if a self-defense is established, that would result in an acquittal of the homicide. It wouldn't result in an acquittal of possibly the other charges because there were certainly other charges such as possession of a weapon, possession of a weapon for an unlawful purpose, which, you know, those wouldn't have been not guilties if there was an acquittal of self-defense. But, you know.

[. . .]

[STATE]: Okay. Did you even advise the defendant to reject any plea offer throughout this case?

[TRIAL COUNSEL]: No, it's not my practice when I discuss plea offers with clients to advise them one way or the other. I just advise them of their potential exposure, what their defenses are in the event that, you know, they go to trial and their defenses are accepted by the jury, what the potential sentence would be for any lesser included charges they may get convicted of.

But I don't tell a client to either accept
or reject an offer.

[. . .]

[STATE]: So just so I'm clear, with regards
to advising a client, would you ever advise
a client to reject a plea offer explicitly,
say I advise you to reject this plea offer,
don't take it?

[TRIAL COUNSEL]: No, I would never tell a
client to reject a plea offer.

ECF No. 8-55 at 9, 12, 16.

Petitioner conceded at the evidentiary hearing that trial
counsel had advised him of his possible sentence exposures at
trial and his sentence exposure if he accepted the State's plea
offer.  See ECF No. 8-55 at 19-28.  Petitioner never testified
that trial counsel advised him to reject the State's plea offer.
See generally ECF No. 8-55; see also Moon, 2016 WL 6900736, at *
5 ("it is uncontroverted [trial counsel] never advised against
accepting the subject plea offer.").  Petitioner stated, in
relevant part:

[PETITIONER]: [. . .] He said this is what
they're offering and this is what's going to
happen if you go to trial.  But if you get
found not guilty of self-defense you'll be
acquitted of that.  But if you get found
guilty of the passion provocation you'll be
looking at 12 years regardless.

[. . .]

[STATE]: Okay.  So did Mr. Snyder tell you
what your maximum prisoner sentence could
be?

27

[PETITIONER]: I believe so.  I believe he
did.

[. . .]

[STATE]: Okay.  So it's possible that Mr.
Snyder did tell you what your exposure was
for the parole ineligibility period?

[PETITIONER]: It could be possible.  I'm not
saying he didn't, but you know, I wish he
would have tried to explain it to me a
little better.

[. . .]

[STATE]: Okay.  Now Mr. Snyder told you your
maximum exposure though, right?

[PETITIONER]: Pardon me?

[STATE]: He told you that -- what would
happen if the jury rejected self-defense and
they rejected passion provocation, right?

[PETITIONER]: He may have.

[STATE]: Okay.  Is it possible that he may
have told you that when you were discussing
this 12-year plea offer?

[PETITIONER]: He may have.

[STATE]: So during that time --

[PETITIONER]: I mean, I'm quite sure he did.
I'm quite, I'm quite sure he did.

[. . .]

[STATE]: If I remember your testimony, you
said that Mr. Snyder told you that he
believed you had a good shot at trial.  --

[PETITIONER]: Yes.

> [STATE]: -- Is that right?
>
> [PETITIONER]: Yes.
>
> [STATE]: He didn't say it was absolutely
> certain that you were going to win at trial
> though, did he?
>
> [PETITIONER]: Nothing in life is certain but
> death. I, I understand that. I'd be a
> fool. He -- I looked him like he was crazy
> if he'd a [sic] said that to me.

ECF No. 8-55 at 19, 25-26, 28, 33.

Thus, Petitioner's claim in his habeas Petition that he was misadvised by his trial counsel as to the "advantages and disadvantages of accepting the State's offer over and against the maximum exposure of going to trial[,]" is belied by Petitioner's own testimony at the evidentiary hearing. Petitioner admits that trial counsel informed him of the State's plea offer and his maximum sentence exposure if convicted at trial. Petitioner also admitted that trial counsel explained to him the various scenarios of what could occur at trial, including the penalties if he was convicted of first-degree murder, passion provocation manslaughter, or if he was acquitted based upon a theory of self-defense. Significantly, Petitioner also testified that trial counsel never informed him that he would certainly win at trial, stating, "I [would have] looked [at] him like he was crazy if he'd a [sic] said that to me." See ECF No. 8-55 at 33.

Accordingly, Petitioner has failed to establish that his trial counsel misadvised him to reject the State's plea offer, or that but for the ineffective advice of counsel there is a reasonable probability that Petitioner would have accepted the State's plea offer. Thus, the state court's adjudication of this claim was not an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on this claim.

### iii. Failure to Object to Petitioner's Taped Statement Being Provided During Jury Deliberations

Petitioner next argues that his trial counsel was ineffective for failing to object to the jury's access during deliberations to Petitioner's taped pretrial statement to police. See ECF No. 1 at 28. Petitioner also claims that his appellate counsel was ineffective for failing to raise this issue on direct appeal.[2] See id.

At the beginning of jury deliberations, the trial court instructed both the State and defense counsel to review the evidence that would be sent into the jury room. See ECF No. 8-51 at 44. Part of that evidence included the tape-recorded

---

[2] It does not appear that Petitioner raised the claim regarding ineffective assistance of appellate counsel before the Appellate Division. See Moon, 2015 WL 6394433, at *3. Petitioner appears to have only raised the issue of ineffective assistance of trial counsel. See id. Thus, the Appellate Division did not address that argument.

statement that Petitioner provided to Investigator Moten on February 23, 2003. See id. Petitioner's trial counsel did not object to the tape being sent into the jury room, along with a tape player. See id.

In addressing Petitioner's claim that trial counsel was ineffective for failing to object to the jury's access, the Appellate Division held:

> Defendant next contends trial counsel was ineffective for failing to object to the admission of his taped confession. First, defendant's statement provided key—if not the only-evidence that he acted in self-defense or in the heat of passion. Second, there is not evidence his statement damaged his defense, let alone negatively affected the verdict. Defendant fails to make a prima facie showing of ineffectiveness of trial counsel within the *Strickland-Fritz* test because he failed to object to the admission of the tape.

Moon, 2015 WL 6394433, *5.

Petitioner has not presented, and the Court is unaware of, any United States Supreme Court precedent that delineates whether a jury may have access to a defendant's taped pretrial statement during jury deliberations. "There is no clearly established Supreme Court authority that a jury's playback of a tape that was admitted into evidence violates a defendant's constitutional rights." Butrim v. D'Ilio, Civ. No. 14-4628, 2018 WL 1522706, at *13 (D.N.J. Mar. 28, 2018) (quoting Ewell v. Scribner, 490 F. App'x 891, 893 (9th 2012)) (internal quotation

marks omitted).  See also Vreeland v. Warren, Civ. No. 11-5239,
2013 WL 1867043, *15-16 (D.N.J. May 2, 2013) (finding no
unfairness in allowing jury to have access in the deliberation
room to the tape-recorded statement of the defendant).

However, in Petitioner's claim, he states that "clearly
established law [has] long been decided" on this issue.  See ECF
No. 1 at 28.  Although he does not state what that law is in his
§ 2254 application, his reference is made clear upon examination
of his brief to the Appellate Division.  See ECF No. 8-18 at 2-
5.  Petitioner refers to the New Jersey Supreme Court case,
State v. Michaels, 625 A.2d 489 (N.J. Super. Ct. App. Div.
1993), which held that "it is error" to allow a jury to have a
witness' videotaped live trial testimony "and a means of playing
it *in the jury room*."  See id. at 523 (emphasis in original).
The court's justification in reaching this decision was that a
"witness' actual image, available in a video replay, present
much more information than does a transcript reading," and to
have a witness' testimony "brought before the jury a second
time, after completion of the defense case, to repeat exactly
what [the witness already] testified to in the State's case"
could present unfair prejudice to the defendant.  See id. at
524.  Petitioner also cites to the Appellate Division's
subsequent holding in State v. Brown, 827 A.2d 346 (N.J. Super.
Ct. App. Div. 2003), which held that read back of a witness'

live trial testimony "must be conducted in open court, on the record, and under the supervision of the presiding judge." <u>See id</u>. at 352. Both of these cases referred to witness testimony presented at trial, and not to statements that had been admitted into evidence.

It was not until 2008, well after Petitioner's trial in 2005 and direct appeal in 2007, that the New Jersey Supreme Court finally addressed "whether a taped pretrial statement, <u>which has been introduced into evidence</u>, may be reviewed by the jury during deliberations[.]" <u>See</u> <u>State v. Burr</u>, 948 A.2d 627, 634 (N.J. 2008)) (emphasis added). <u>Burr</u> distinguished this question from the issue in <u>Michaels</u>, stating that unlike in <u>Michaels</u> "the videotape at issue [in <u>Burr</u>] was admitted into evidence as an exhibit," and juries generally have access to admitted evidence during deliberations. <u>See id</u>. at 635. On this case of first impression, the court ultimately held, however, that juries should not have "unfettered access" to admitted videotaped statements out of fear that the jury might unfairly emphasize those statements "over other testimony presented at trial." <u>Id</u>. at 636.

Here, Petitioner is unable to satisfy his burden of establishing that the state court's adjudication of this ineffective assistance of counsel claim was an unreasonable application of <u>Strickland</u>. To prevail on an ineffective

assistance of counsel claim, a petitioner must "affirmatively prove" that the alleged errors had an adverse effect on his defense. See Strickland, 466 U.S. at 693. Petitioner here alleges only that the tape should not have been sent to the jury room. See ECF No. 1 at 28-29. Petitioner does not allege that the error had an adverse effect on his defense. See id. Indeed, as the Appellate Division aptly emphasized, Petitioner's statement was crucial evidence, if not the only evidence, that Petitioner acted in self-defense. See Moon, 2015 WL 6394433, at *5. Trial counsel emphasized that fact himself during his closing statement:

> And when David Moon came back, there was a
> gathering between himself and Corie Carter,
> a peacing up, so to speak. There was a
> hugging between Corie Carter and David Moon.
> And it was at that moment that <u>David Moon
> said when he gave his taped interview to the
> police and explained his version of events</u>,
> he said Corie Carter whispered into my ear
> if you tell anybody about this, I'm going to
> kill you, and that, ladies and gentlemen of
> the jury, is the second act of provocation
> that incited or caused a reaction in David
> Moon, and that reaction, ladies and
> gentlemen of the jury, gets us to the self-
> defense that the defense submits.

ECF No. 8-50 at 57 (emphasis added).

The New Jersey Supreme Court in <u>Burr</u> stated that the prejudice in allowing the jury unfettered access to a taped statement was that the jury might give undue weight to that statement resulting in a disadvantage to the defendant. See

Burr, 948 A.2d at 636. Here, the videotaped statement favored Petitioner. The fact that this statement primarily served the defense is evidenced by the State's concern over the jury charge. See ECF No. 8-50 at 39. During the jury charge conference, the State requested that the trial court instruct the jury that "simply because the State produced [the taped statement] doesn't mean the State believes it." See id. The prosecutor went on to explain to the trial court, "the State is not bound to adopt as true that part of the statement which exculpates [Petitioner] or self -- that is the relevant part I'm trying to get in [to the jury charge]. The fact that I produced it doesn't mean that I adopt all the exculpatory stuff." See id.

Given the significance of Petitioner's taped statement to his defense theories of self-defense and passion provocation, Petitioner is unable to demonstrate that the he was prejudiced by trial counsel's failure to object to the jury's access to the statement.

Petitioner is similarly unable to demonstrate that appellate counsel was ineffective for not raising this issue on direct appeal. Generally, appellate counsel has no obligation to raise every claim on direct appeal. See Smith v. Robbins, 528 U.S. 259, 288 (2000); United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999). The decision of which issues to raise

on appeal is a strategic choice.  See Smith, 528 U.S. at 288

(citing Jones v. Barnes, 463 U.S. 745 (1983)).  The chief

component of effective appellate advocacy is the winnowing out

of weaker claims in favor of those with a greater chance of

success.  See Jones, 463 U.S. at 753.  "Declining to raise a

claim on appeal, therefore, is not deficient performance unless

that claim was plainly stronger than those actually presented to

the appellate court."  Davila v. Davis, 137 S. Ct. 2058, 2067

(2017).

Significantly, there is "no holding of the Supreme Court

clearly establishing that to perform within the wide range of

reasonable professional assistance, counsel must accurately

predict how the law will turn out or hedge every bet in the hope

of a favorable development."  See Dorvil v. Sec'y, Fla. Dep't of

Corr., 663 F. App'x 852, 860 (11th Cir. 2016) (internal citation

and quotation marks omitted).  Several of the Circuit Courts of

Appeals have held that "appellate counsel is not ineffective for

failing to predict the development of the law."  See Thompson v.

Warden, Belmont Corr. Inst., 598 F.3d 281, 288 (6th Cir. 2010);

see also United States v. Geiner, 443 F. App'x 378, 380-82 (10th

Cir. 2011) (holding that counsel is not ineffective for failing

to "predict the passage of future law"); Green v. Johnson, 116

F.3d 1115, 1125 (5th Cir. 1997) ("[T]here is no general duty on

the part of defense counsel to anticipate changes in the law.");

Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."); see also United States v. Boone, 2:12-cr-162-12, 2016 WL 3057655, at *7 (W.D. Pa. May 31, 2016) ("It is not 'ineffective' for counsel to fail to anticipate a dramatic change in the law.").  Some circuit courts, however, have also stated that "in a rare case" may counsel be deemed ineffective if they fail to raise "an issue whose resolution is clearly foreshadowed by existing decisions."  See Thompson, 598 F.3d at 288.

Here, Petitioner has not demonstrated that his claim regarding the jury's access to his taped pretrial statement, provided a plainly stronger claim than the other issues raised by appellate counsel.  At the time Petitioner's case was tried and directly appealed, the case law was generally that once an exhibit had been admitted into evidence, the jury could access it during deliberations.  See Burr, 948 A.2d at 635.  However, it was not until 2008 – one year after Petitioner's direct appeal was decided – that the New Jersey Supreme Court decided Burr and held that juries should no longer have "unfettered access" to taped pretrial statements which have already been

admitted into evidence.[3]  See Burr, 948 A.2d at 634-36.  The

Supreme Court in Burr even expressly acknowledged the novelty of

the issue, stating, "[t]he issue of whether a taped pretrial

statement, which has been introduced into evidence, may be

reviewed by a jury during deliberations has never before been

decided by our courts."  See Burr, 948 A.2d at 634.  Thus,

Petitioner in unable to demonstrate that his novel claim, which

had not yet been decided by the Supreme Court before his appeal,

would have been a plainly stronger issue on appeal than the

other issues raised by appellate counsel, especially considering

that one of the appellate arguments raised resulted in a

reversal of Petitioner's conviction for endangering an injured

victim.  See State v. Moon, 933 A.2d 11, 17 (N.J. Super. Ct.

App. Div. 2007).

Moreover, Petitioner has not demonstrated this is one of

those "rare cases" in which counsel is ineffective for failing

to raise an issue whose future resolution was clearly

foreshadowed by existing decisions.  See Thompson, 598 F.3d at

288.  When the Appellate Division issued their decision in Burr

in 2007, they also acknowledged the lack of case law on the

---

[3] The Appellate Division had addressed, and ultimately
prohibited, the different but related issue of whether a jury
may have access to a witness's videotaped live trial testimony.
See State v. Michaels, 625 A.2d 489, 524 (N.J. Super. Ct. App.
Div. 1993).

topic: "Our research has not revealed any cases dealing with the precise issue of replaying a witness's videotaped pre-trial statement." See State v. Burr, 921 A.2d 1135, 1158 (N.J. Super. Ct. App. Div. 2007). Yet, even the Appellate Division's own ruling in Burr would not have acted as a clear foreshadow of the forthcoming New Jersey Supreme Court holding because when the Appellate Division considered Burr, it analyzed only the more narrow issue of replaying a *witness's* videotaped pre-trial statement which had been admitted into evidence. See id. at 1159 (emphasis added). It was not until the New Jersey Supreme Court decided Burr, however, that the court broadened the scope of the issue to include *all* taped pretrial statements admitted into evidence, holding that such statements should be restricted from a jury's unrestricted access, despite the fact that they are also admitted evidence. See Burr, 948 A.2d at 634-36. Given the lack of case law in this area of law at the time of Petitioner's appeal, this does not appear to be one of those "rare cases" where the future resolution of the issue was clearly foreshadowed by existing decisions, such that counsel was ineffective for failing to anticipate a change in the law. See Thompson, 598 F.3d at 288.

Accordingly, Petitioner is unable to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and he is unable to

demonstrate that his appellate counsel was ineffective.  See
Woods, 135 S. Ct. at 1375.  Petitioner is not entitled to relief
on this claim.

### B. Errors in the Jury Charge

Petitioner also raises three claims regarding errors in the
trial court's jury charge.  Specifically, Petitioner argues that
the trial court erred in denying his request for a voluntary
intoxication and a corroboration charge, that the trial court
erred when it misstated the law regarding passion provocation
manslaughter, and that the trial court erred when it
"erroneously" instructed the jury regarding unanimity of the
verdict.  See ECF No. 1 at 16-19, 22-23, 26-27, 30-31.

Generally, jury instructions are a matter of state law and
are not cognizable in federal habeas review.  See Engle v.
Isaac, 456 U.S. 107, 120-21 n.21 (1982); see also Zettlemoyer v.
Fulcomer, 923 F.2d 284, 309 (3d Cir. 1991).  However, an
improper jury instruction may provide an adequate ground for
habeas relief if the instruction violates the petitioner's
Fourteenth Amendment right to due process of law.  See Cupp v.
Naughten, 414 U.S. 141, 146 (1973).  "The question in such a
collateral proceeding is 'whether the ailing instruction by
itself so infected the entire trial that the resulting
conviction violates due process,' not merely whether 'the
instruction is undesirable, erroneous, or even universally

condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (quoting Cupp, 414 U.S. at 147). Importantly, it is "well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).

Where the error is the omission of an instruction, a petitioner's burden is "especially heavy" because an omission is "less likely to be prejudicial than a misstatement of the law." See id. at 155. In that case, a petitioner must demonstrate that the omission was so "inconsistent with the rudimentary demands of fair procedure" as to result in a miscarriage of justice. See Smith v. Arvonio, Civ. No. 93-25, 1994 WL 327123, *3 (D.N.J. June 24, 1994) (citing Hill v. United States, 368 U.S. 424, 428 (1962)).

> ### i. Trial Court's Denial of Voluntary Intoxication Charge

Petitioner alleges that there was sufficient evidence to support a charge of voluntary intoxication, and the trial court erred in denying Petitioner's request to have that instruction provided to the jury. See ECF No. 1 at 16-17. Petitioner asserts that as a result of his intoxication he was unable to form the requisite intent for knowing or purposeful murder, and the jury should have been given the opportunity to consider

whether "petitioner's faculties were prostrated sufficiently to impact upon his ability to engage in knowing or purposeful activities." See id. at 18-19.

Under N.J. Stat. Ann. § 2C:2-8(a), intoxication "is not a defense unless it negatives an element of the offense."[4]  The New Jersey Supreme Court has held that a defendant's "intake of even large quantities of alcohol will not suffice" for an intoxication defense.  See State v. Cameron, 514 A.2d 1302, 1308 (N.J. 1986) (quoting State v. Stasio, 396 A.2d 1129, 1143 (N.J. 1979)).  Rather, a defendant must show that he was "of such a great prostration of the faculties that the requisite mental state was totally lacking" in order to warrant a charge regarding voluntary intoxication.  Id.

In denying this claim on direct appeal, the Appellate Division held, in pertinent part:

> A jury instruction on self-induced
> intoxication negating an element of a crime
> is required only if the evidence provides "a
> rational basis for the conclusion that
> defendant's 'faculties' were so 'prostrated'
> that he or she was incapable of forming" a
> purpose or having the knowledge that is
> required for conviction of a crime charged.
> State v. Mauricio, 117 N.J. 402, 418-19
> (1990).  While defendant said he had
> consumed alcohol and PCP-laced marijuana,
> there was no evidence of the time of
> consumption, the quantity consumed or its

---

[4] This is rule is subject to exception where the intoxication was either "pathological" or "not self-induced."  N.J. Stat. Ann. § 2C:2-8(a) and (d).

> impact on his ability to function or recall
> significant events.  See ibid.  Defendant
> was able to give a detailed account of the
> events.  Moreover, neither Carter nor
> Martinez described any behavior by defendant
> that suggested he was incapable of acting
> with purpose or knowledge.  See id. at 419
> (quoting State v. Cameron, 104 N.J. 42, 55
> (1986)).

ECF No. 8-9 at 13-14.

Here, Petitioner has failed to meet his "especially heavy"
burden of demonstrating that the failure to charge the jury with
voluntary intoxication denied him his due process rights.  At
the outset, this court notes that Petitioner's claim appears to
challenge only the trial court's actions under New Jersey state
law concerning when a charge of voluntary intoxication is
warranted.  Such an error raises only an issue of state law
concern, and not a claim for which this Court could grant
federal habeas relief.  See Carpenter v. Vaughn, 296 F.3d 138,
152-53 (3d Cir. 2002) (denying review of petitioner's claim that
the "trial court erred in failing to give an instruction on
intoxication" because the decision was "a question of state
law").

However, to the extent that Petitioner is raising a federal
law claim, there appears to have been no error committed by the
trial court in denying Petitioner's request for an intoxication
charge.  There was scant evidence regarding Petitioner's alleged
state of intoxication.  Witnesses Willie Carter and John

Martinez did testify that there had been drinking and smoking occurring on the night of the murder, and Petitioner did admit during his taped statement to police that he had been drinking and "smoking wet." See ECF No. 8-50 at 50-52. However, there was no testimony that Petitioner was, or appeared to be, intoxicated, and there was no testimony about how many alcoholic beverages or drugs Petitioner may have ingested. See id. But there was evidence presented that Petitioner was able to give a vivid, detailed, and coherent statement to police hours after the murder and Investigator Moten testified that Petitioner never appeared lethargic during the interview. See id. at 52. Considering the entire trial record, Petitioner did not establish that his faculties were so prostrated as to warrant an intoxication charge. See Cameron, 514 A.2d at 1308. Accordingly, Petitioner has not demonstrated that the trial court's failure to provide this instruction resulted in a due process violation. Petitioner is not entitled to relief on this claim.

> ### ii. Trial Court's Failure to Instruct Jury Regarding Corroboration

Petitioner next asserts that the trial court also erred in not providing the jury with a "proper corroboration charge" in violation of his Fourteenth Amendment rights.[5] See ECF No. 1 at

---

[5] It appears that this claim is unexhausted. Petitioner raised

26.  Specifically, Petitioner argues that the evidence presented against him was "very slim" aside from his confession to police, and the trial court should have instructed the jury regarding the State's duty to independently corroborate Petitioner's confession.  <u>See</u> <u>id</u>. at 27.

Under both New Jersey and federal law, "an uncorroborated extrajudicial confession cannot [alone] provide the evidential basis to sustain a conviction."  <u>State v. Lucas</u>, 152 A.2d 50, 57 (N.J. 1959); <u>see</u> <u>also</u> <u>Smith v. United States</u>, 348 U.S. 174, 157 (1954) ("an accused may not be convicted on his own uncorroborated confession.").  This corroboration rule mandates that "[a]ll elements of the offense must be established by independent evidence or corroborated admissions."  <u>See</u> <u>State v. Di Frisco</u>, 571 A.2d 914, 925 (N.J. 1990) (quoting <u>Smith</u>, 348 U.S. at 156).  In New Jersey, "[a]s long as the confession is 'corroborated by other evidence tending to strengthen it, … the criminal agency (as well as defendant's connection with the crime) may be proven by the confession itself.'"  <u>State v. Abrams</u>, 607 A.2d 179, 185 (N.J. 1992) (quoting <u>State v. Mancine</u>,

---

the issue in a <u>pro</u> <u>se</u> brief before the PCR court, but the issue was not raised on appeal.  <u>See</u> ECF Nos. 19 and 23.  However, to the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  <u>See</u> <u>Taylor v. Horn</u>, 504 F.3d 416, 427 (3d Cir. 2007); <u>Bronshtein v. Horn</u>, 404 F.3d 700, 728 (3d Cir. 2005).

590 A.2d 1107, 1116 (N.J. 1991)).  Similarly, under federal law, the independent evidence does not, by itself, have to prove the charged offense.  See United States v. Brown, 617 F.3d 857, 862 (6th Cir. 2010) (citing Smith, 348 U.S. at 156).  Rather, this corroborating evidence is meant to "merely 'ensure the reliability of the confession or admission of the accused.'" See id. (quoting Smith, 348 U.S. at 156).  "It is clear then, that under either the New Jersey rule or that established by the Supreme Court in Smith, the State need only provide corroborating evidence which would strengthen the reliability of the defendant's confession and establish that the crime in question did actually occur."  McDonald v. Warden, Civ No. 15-6231, 2016 WL 3556596, at *7 (D.N.J. June 28, 2016).

Here, the State presented more than sufficient evidence to independently corroborate Petitioner's confession.  The State offered the testimony of both Willie Carter and John Martinez, who with Petitioner and the victim the night of the murder. Carter testified that he was about two feet away from Petitioner and the victim when he heard a single gunshot.  See ECF No. 8-46 at 19-20.  When Carter turned around, he saw the victim falling to the ground and Petitioner standing behind the victim with a gun in his hand.  See id.

Martinez testified that although he did not see Petitioner shoot the victim, he heard the sound of a gunshot, he saw

Petitioner holding two guns, and he heard Petitioner repeatedly say, "I shot the mother fucker." See id. at 80-81. Martinez also testified that he saw Petitioner "drag" the victim's body to a different location. See id. at 82-83.

Investigator Moten also testified at trial that Petitioner eventually informed the police where he had hidden the gun he used to commit the crime. See ECF No. 8-48 at 76. A ballistics expert testified that he was able to conclusively determine that the bullet recovered from the victim's head had been discharged from the gun police recovered. See ECF No. 8-47 at 43.

Given the witness testimony presented at trial, as well as the physical evidence of Petitioner's gun and the bullet recovered from the victim, there was more than sufficient evidence presented at trial to corroborate Petitioner's confession and to strengthen its reliability. Accordingly, Petitioner has failed to show that the trial court erred by not providing a corroboration instruction, or that his conviction was a violation of Due Process. Petitioner is not entitled to habeas relief on this claim.

> iii. *Trial Court's Instruction Regarding Unanimity of the Verdict*

Petitioner next contends that the trial court violated his fundamental right to due process by providing an erroneous jury

instruction regarding the unanimity of the verdict.[6]  See ECF No.

1 at 30-31.  In support of his claim, Petitioner points to the

following portion of the jury charge:

> Now, all jurors do not have to agree
> unanimously concerning which form of murder
> is present so long as all believe that it
> was one form of murder or the other.

Id. at 30.

Petitioner submits that this statement so confused the jury

that it resulted in their submitting a question to the court

asking, "Do we all have to agree if it was passion/provocation?"

See id. at 31.  Petitioner states the jury's confusion was "so

prejudicial" as to result in the jury rendering a verdict that was

against the weight of the evidence.  See id

Here, in order to properly understand the allegedly

deficient jury instruction, it must be placed into context.

When charging the jury, the trial court explained that first-

degree murder could be committed with either a "purposeful" or

"knowing" mental state.

> Now, in order for you to find the defendant
> guilty of purposeful serious bodily injury

---

[6] It appears that this claim raised by Petitioner is unexhausted.
Petitioner did raise this claim before the PCR court.  See ECF
No. 8-19 at 34.  However, Petitioner did not raise this claim
when he appealed his PCR to the Appellate Division.  See ECF No.
8-23 at 2.  Yet, to the extent that a petitioner's
constitutional claims are unexhausted or procedurally defaulted,
a court can nevertheless deny them on the merits under 28 U.S.C.
§ 2254(b)(2).  See Taylor v. Horn, 504 F.3d 416, 427 (3d Cir.
2007); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005).

murder, the State must prove beyond a
reasonable doubt that it was defendant's
conscious object to cause serious bodily
injury that then resulted in the victim's
death, that the defendant knew that the
injury created a substantial risk of death,
and that it was highly probable that death
would result.

In order for you to find the defendant
guilty of <u>knowing</u> serious bodily injury
murder, the State must prove beyond a
reasonable doubt that the defendant was
aware that it was practically certain that
his conduct would cause serious bodily
injury that then resulted in the victim's
death, that defendant knew the that the
injury created a substantial risk of death,
and that it was highly probable that death
would result.

Now, whether the killing is committed
purposely or knowingly causing death or
serious bodily injury resulting in death
must be within the design or contemplation
of the defendant.

<u>See</u> ECF No. 8-51 at 9-10 (emphasis added).

After that explanation, the court went on to state:

Now, all jurors do not have to agree
unanimously concerning which form of murder
is present so long as all believe that it
was one form of murder or the other.
However, for a defendant to be guilty of
murder, all jurors must agree that the
defendant either knowingly or purposely
created the death or serous bodily injury
resulting in the death of Corie Carter.

<u>Id</u>. at 11-12.

The trial court then finished charging the jury with the

lesser included offenses of passion provocation manslaughter,

49

aggravated manslaughter, and reckless manslaughter, as well as
the other charges contained in the indictment.  See id. at 12-
16.

Shortly after deliberations began, the jury submitted a
question asking whether they all had to be unanimous as to
passion provocation manslaughter.  See ECF No. 8-51 at 47.  The
trial court, with the agreement of both counsel, responded to
the jury by stating, "The answer to that question is yes.  Your
verdict must be unanimous, okay?"  See id. at 59-60.  The jury
subsequently asked twice to be re-read the charge as to passion
provocation manslaughter and requested a copy of the jury charge
to have in the deliberation room.  See ECF No. 8-52 at 2.  No
further questions were asked.  See id.

"Habeas relief for a due process violation concerning an
absent or defective instruction is available when the absence of
an instruction, or a defective instruction, infects the entire
trial with unfairness."  See Albrecht v. Horn, 485 F.3d 103, 129
(3d Cir. 2007) (citing Cupp, 414 U.S. at 147).  "Before a
federal court may overturn a conviction resulting from a state
trial in which this instruction was used, it must be established
not merely that the instruction is undesirable, erroneous, or
even 'universally condemned,' but that it violated some right
which was guaranteed to the defendant by the Fourteenth
Amendment."  Cupp, 414 U.S. at 146.  Moreover, "[a] jury is

presumed to understand a judge's answer to its question." Weeks
v. Angelone, 528 U.S. 225, 234 (2000).  If a jury remains
confused as to their role, "they might, and probably would, have
signified their desire to the court."  See id. (quoting
Armstrong v. Toler, 11 Wheat. 258, 279, 6 L.Ed. 468 (1826)
(opinion of Marshall, C.J.)).  If the jury does not return with
additional questions, "'it may be fairly presumed that they had
nothing further to ask.'  To presume otherwise would require
reversal every time a jury inquires about a matter of
constitutional significance, regardless of the judge's answer."
See id. (quoting Armstrong, 11 Wheat. at 279).

    Here, Petitioner has not demonstrated that the trial
court's jury charge on first-degree murder "so confused" the
jury as to infect the entire trial with unfairness.  The trial
court's instructions, taken verbatim from the New Jersey Model
Jury Charge for first-degree murder, clearly informed the jury
that they must be unanimous in deciding that Petitioner
committed first-degree murder, but that they need not be
unanimous in deciding whether he had a purposeful or knowing
mental state.  See New Jersey Model Jury Charges (Criminal),
"Murder (N.J.S.A. § 2C:11-3a(1) and 3a(2)" (revised Mar. 22,
2004).  Although the jury asked for clarification on whether
they also needed to unanimously agree on passion provocation
manslaughter, the trial court properly instructed them that yes,

the verdict must be unanimous. The jury's failure to ask any further questions on that matter indicates that they understood the trial court's answer to their question, and that they had no further confusion. See Weeks, 528 U.S. at 234. Accordingly, Petitioner has not proven that the jury was "so confused" about the instructions, as to violate his due process rights. Petitioner is not entitled to relief on this claim.

### iv. *Cooling Off Period*

Petitioner alleges that the trial court also erred by misstating the law when it provided the jury with the passion provocation charge.[7] See ECF No. 1 at 22. In New Jersey, passion provocation manslaughter has four factors that distinguish it from first-degree murder. See State v. Mauricio, 568 A.2d 879, 883-84 (N.J. 1990). Those four factors are:

(1) There was adequate provocation;

(2) The provocation actually impassioned defendant;

(3) Defendant did not have a reasonable time to cool off between the provocation and the act which caused death; and

---

[7] It appears that this claim is unexhausted. Petitioner did not raise this claim on direct review and when he did raise it during his PCR proceedings, he framed it as an ineffective assistance of counsel claim. See ECF No. 8-17 at 11 ("Trial and appellant counsel were ineffective for failing to object or appeal regarding the improper jury charges.") However, to the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). See Taylor, 504 F.3d at 427; Bronshtein, 404 F.3d at 728.

> (4) Defendant did not actually cool off before
> committing the act which caused death.

New Jersey Model Jury Charges (Criminal), "Murder,

Passion/Provocation and Aggravated/Reckless Manslaughter

(N.J.S.A. 2C:11-3a(1) and 3a(2); 2C:11-4a, b(1) and b(2)"

(revised Mar. 22, 2004).

Petitioner states that the instructional error in his trial

occurred when the court attempted to explain the third factor to

the jury, and stated:

> The third factor you must consider is
> whether the State has proven beyond a
> reasonable doubt that the defendant had a
> reasonable time to cool off.  In other
> words, you must determine whether the State
> has proven that the time between the
> provoking event and the act which caused the
> death was inadequate for the return of a
> reasonable person's self-control.

ECF No. 8-51 at 13 (emphasis added).

Petitioner states that although this language conformed

with the model jury charge, that the correct charge would have

stated that the time between the provoking event and the act

which caused the death was adequate for the return of a

reasonable person's self-control.  See ECF No. 1 at 22.

Petitioner adds that the trial court's reiteration of this same

improper charge in response to jury questions compounded its

prejudicial effect.  See id. at 23.  In support of his claim,

Petitioner cites to the New Jersey Appellate Division case State

v. Docaj, 971 A.2d 418 (N.J. Super. Ct. App. Div. 2009), which
was decided four years after Petitioner's trial and held that
the use of the word "inadequate" was an error in the model jury
charge.  See id. at 423.

Although Petitioner raised this claim in the context of
ineffective assistance of counsel before the Appellate Division,
the Appellate Division also ruled that the use of the word
inadequate "did not have the capacity to mislead the jury here
and prejudice defendant."  See Moon, 2015 WL 6394433, at *4.
The Appellate Division recognized that the same issue had been
presented in Docaj, and in both Petitioner's case and the Docaj
case:

> [T]he error [] was but one iteration
> imbedded in a charge that contained three
> entirely correct articulations of the
> State's burden regarding the third factor
> [of passion provocation].  In both
> describing the elements of murder and in
> summing up the State's burden as to the
> factors of passion/provocation manslaughter,
> the charge clearly conveyed the State's
> burden of proof.  Specifically, the jury was
> instructed three times that, as to this
> factor, the State's burden was to prove
> beyond a reasonable doubt that defendant had
> a reasonable time to cool off.  The isolated
> error's capacity to dispel that overall
> effect was minimal, at best.

Id. (quoting Docaj, 971 A.2d at 426).

For habeas relief on an erroneous jury instruction, a
petitioner must show both that the jury instruction was

ambiguous, and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of proving every element of the crime beyond a reasonable doubt. See Estelle, 502 U.S. at 72.  In doing so, the court must consider the challenged instruction in context of the charge as a whole, as well as within the context of the entire trial record, and decide whether the charge so infected the trial that the result violated due process.  Id.; see also Cupp, 414 U.S. at 146-47.

In the present case, after reviewing the entirety of the jury charge and the trial record, it does not appear that the jury applied the challenged instruction in a way that relieved the State of proving every element of the charged offense.  As the Appellate Division aptly pointed out, the trial court's description of each of the elements required for murder and explanation of the four factors of passion provocation manslaughter "clearly conveyed the State's burden of proof." See Moon, 2015 WL 6394433, at *4.  Moreover, the State and defense counsel both highlighted the State's burden during their closing arguments.  See ECF No. 8-50 at 54-86.  Defense counsel stated in his closing: "So, ladies and gentlemen of the jury, passion/provocation manslaughter also is a burden, a burden on the State to disprove as well."  See id. at 66.  Defense counsel went on to explain the four factors of passion provocation

manslaughter, including that "the defendant did not have a reasonable time to cool off between the provocation and the act which caused the death," and asserted that "the State cannot disprove manslaughter." See id. Thus, it was clear from the entirety of the jury charge and the trial record that it was the State's burden to disprove a theory of passion provocation manslaughter and to prove that Petitioner had an adequate amount of time to cool down in between the provoking and the murder of the victim. Accordingly, Petitioner has not demonstrated that the challenged jury charge so infected the entire trial that the result violated due process. Petitioner is not entitled to relief on this claim.

### C. Prejudicial Statements

Petitioner asserts that the trial court erred in declining to grant a mistrial following three instances of "highly prejudicial" improprieties by the State. See ECF No. 1 at 32. Specifically, Petitioner alleges that the prosecutor inappropriately expressed her personal opinion regarding Petitioner's guilt during her opening remarks and that the prosecutor twice elicited prejudicial testimony from witnesses concerning a mugshot of Petitioner. See id. at 32-36. Petitioner submits that these instances of misconduct were each so prejudicial, and the trial court's remedial efforts so inadequate, as to mandate a mistrial. See id. at 32.

Petitioner states that the first impropriety occurred during the prosecutor's opening remarks. Petitioner points to the following statement made by the prosecutor:

> Ladies and gentlemen, I'll submit to you that after you review all the evidence, you will come to the same conclusion that I do, that this was not justified at all, this was not justified in Camden, not justified anywhere.

ECF No. 8-45 at 19.

At the end of the prosecutor's opening, defense counsel immediately requested a sidebar and made a motion for a mistrial based upon the prosecutor's reference to her own personal opinion. See id. at 20-21. The trial court declined to grant a mistrial, reasoning that the mistake could be cured by a jury instruction. See id. at 22. The trial court thereafter instructed the jury as follows:

> [THE COURT]: Ladies and gentlemen of the jury, at the conclusion of her opening statement, the Assistant Prosecutor, Ms. Soumilas, made an inadvertent comment interjecting a personal opinion in this case, and that comment was as follows:
>
> "Ladies and gentlemen, I'll submit to you that after you review all of the evidence, you will come to the same conclusion that I do, that this was not justified at all, this was not justified in Camden, not justified anywhere."
>
> Ladies and gentlemen of the jury, it is entirely improper for an attorney to interject their personal opinion in a case because it is completely irrelevant and

should not even be considered by you in your
determination of guilt or innocence.

As jurors, ladies and gentlemen, you are to
listen to the evidence in the case and
arrive at your decision based on the
evidence presented.

I am instructing you that you are to ignore
and not consider in any way any opinion
expressed by the Assistant Prosecutor in her
opening statement.

Id. at 23-24.

The second alleged impropriety arose when the prosecutor

referenced a photograph of Petitioner to witness Willie Carter.

[PROSECUTOR]: Okay. Now when you gave --
when you gave your statement to Investigator
Moten, did he ask you to identify, using a
photo, the person who shot Corie?

[CARTER]: Yes.

[PROSECUTOR]: Did he hand you a photo?

[CARTER]: Yes.

[PROSECUTOR]: I'm going to show you -- let
me show this to you.

[DEFENSE COUNSEL]: Your Honor, can we
approach first?

ECF No. 8-46 at 35-36.

After this exchange, defense counsel objected, explaining

that the statement that Investigator Moten had shown Carter a

photo of Petitioner was inherently prejudicial because "it

implicates that the officers gave a photo of my client which

leads the jury to infer that my client has a prior record." See

58

id. at 36.  Defense counsel then made another motion for a mistrial.  See id.  The trial court again declined to grant the mistrial but struck the testimony of Carter about the photograph shown to him.  See id. at 37.  The trial court instructed the jury to "disregard the last question that was asked by the prosecutor of this witness and disregard his answer to that question."  See id. at 38.

Finally, Petitioner states that the third alleged impropriety arose when Investigator Moten testified that he had been shown a mug shot of Petitioner.

> [PROSECUTOR]: And what did you do upon learning there were [witnesses] you needed to talk to?
>
> [INVESTIGATOR MOTEN]: Well, again, I met with Detective Matthews.  We -- again, he briefed me.  I also spoke with Detective Finneman, who, at that point, presented me with a cassette tape and he advised that he had already obtained a taped statement from Willie Carter.  Again, I was presented with that mugshot that was given to me by Detective Matthews.

ECF No. 8-48 at 65.

Defense counsel again immediately requested a sidebar and made yet another motion for a mistrial, arguing that the word "mug shot" was so prejudicial that a jury would not be able to disregard the reference despite a curative instruction.  See id. at 65-66.  The trial court again declined to grant a mistrial, deciding instead to instruct the jury to disregard the

testimony.  See id. at 66.  The trial court stated, in pertinent
part:

> Ladies and gentlemen of the jury, you will
> disregard any testimony regarding -- by this
> witness regarding any mugshots.  You will
> not consider that at all.  You will not --
> you will disregard it and I will strike the
> testimony of this witness with regard to any
> using of the term "mugshot."

Id.

On direct appeal, Petitioner raised the claim of the trial
court's failure to declare a mistrial after each of the three
alleged improprieties.  See ECF No. 8-9 at 7-8.  The Appellate
Division held that this claim "lack[ed] sufficient merit to
warrant discussion in a written opinion" beyond the following
brief comments:

> The grant of a mistrial is left to the sound
> discretion of the trial judge.  State v.
> Harvey, 151 N.J. 117, 205 (1997).  There was
> no abuse of that discretion in this case.
> Where a trial judge determines that a jury
> instruction will effectively cure error and
> obviate the need for a mistrial, that
> decision is entitled to deference.  See
> State v. Winter, 96 N.J. 640, 646-47 (1984).
>
> In this case, the judge took steps to
> address the State's errors.  In response to
> the assistant prosecutor's improper opening
> argument stating her conclusions about the
> evidence, the judge told the jurors that the
> argument was "entirely improper [and]
> completely irrelevant," reminded them of
> their obligation to reach a decision based
> on the evidence, and instructed them "to
> ignore and not consider in any way any
> opinion expressed by the assistant

prosecutor in her opening statement." When
the assistant prosecutor asked Carter if the
police had shown him a photo of defendant,
the trial just sustained defense counsel's
objection and directed the jury to disregard
the question. When a detective testified
that he was shown a "mug shot" of defendant,
the judge denied defense counsel's motion
for a mistrial, struck the testimony, and
instructed the jurors to "disregard any
testimony . . . by this witness regarding
any mug shots." We cannot conclude that the
judge abused his discretion in determining
that this solitary and fleeting, albeit
highly improper, mention of a mug shot could
be addressed with a prompt curative
instruction and did not require a mistrial.
See State v. Porambo, 226 N.J. Super. 416,
425-26 (App. Div. 1988) (finding harmless
error under similar circumstances).

ECF No. 8-9 at 13-15.

The United States Supreme Court has explained that "trial

judges may declare a mistrial 'whenever, in their opinion,

taking all the circumstances into consideration, there is a

manifest necessity' for doing so." See Renico v. Lett, 559 U.S.

766, 773-74 (2010) (quoting United States v. Perez, 22 U.S. 579,

580 (1824)). "The decision to declare a mistrial is left to the

'sound discretion' of the judge, but 'the power ought to be used

with the greatest caution, under urgent circumstances, and for

very plain and obvious causes." Id. at 774 (quoting Perez, 22

U.S. at 580). "A mistrial is not necessary where the improper

remarks were harmless, 'considering their scope, their relation

to the context of the trial, the ameliorative effect of any

curative instructions and the strength of the evidence

supporting the conviction.'" United States v. Lee, 634 F. App'x

862, 865 (3d Cir. 2015) (quoting United States v. Rivas, 493

F.3d 131, 140 (3d Cir.2007)).

Moreover, when a court provides a curative instruction,

juries are presumed to disregard the inadmissible evidence

inadvertently presented to them, unless there exists "an

overwhelming probability that the jury will be unable to follow

the court's instructions, and a strong likelihood that the

effect of the evidence would be devastating to the defendant."

See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (internal

citations and quotation marks omitted).

Here, Petitioner has failed to demonstrate that the state

court's adjudication of this claim was contrary to clearly

established federal law. The Appellate Division applied New

Jersey state law when it reviewed the trial court's denial of

Petitioner's motions for a mistrial. See ECF No. 8-9 at 14-15.

In New Jersey, "[t]he grant of a mistrial is left to the sound

discretion of the trial judge." State v. Harvey, 699 A.2d 596,

639 (N.J. 1997) (citing State v. DiRienzo, 251 A.2d 99 (N.J

1969)). Because this standard mirrors the standard articulated

in Perez, this Court concludes that the New Jersey Appellate

Division's decision was not contrary to clearly established

federal.

The Appellate Division's adjudication of this claim was also not an unreasonable application of clearly established federal law. Each of the three allegedly prejudicial remarks was brief and was promptly followed by a curative instruction. Petitioner has not demonstrated, or even alleged, that there was an "overwhelming possibility" that the jury was unable to disregard the inadmissible evidence inadvertently presented to them. See Greer, 483 U.S. at 766 n.8. Additionally, the strength of the evidence against Petitioner was strong. See Lee, 634 F. App'x at 865. Petitioner did not dispute that he murdered the victim. Instead, his trial strategy was one of self-defense and/or passion provocation. Accordingly, when considering the limited scope of the remarks, the trial court's prompt curative instructions, and the strength of the evidence supporting Petitioner's conviction, Petitioner cannot demonstrate that the Appellate Division unreasonably applied clearly established federal law when arriving at their decision. Petitioner is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

This Court will deny a certificate of appealability because jurists of reason would not find it debatable that dismissal of the Petition is correct.

## V.    CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability shall not issue.  An appropriate Order follows.

Dated: June 25, 2019                      s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.